Filed 9/27/21  P. v. Higgins CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D078460 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN384699) |
| CHARLES WILLIAM HIGGINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury convicted Charles William Higgins of corporal injury to a spouse or cohabitant (Pen. Code,[1] § 273.5, subd. (a)).  The jury found true allegations of personal use of a deadly weapon (§ 12022, subd. (b)(1)) and personal

---

[1]     All further statutory references are to the Penal Code.

infliction of great bodily injury on the victim (§ 12022.7, subd. (e)). Higgins was also convicted of violating a protective order (§ 166, subd. (c)(1)).

Higgins admitted a prior serious felony conviction (§ 667, subd. (a)(1)) and a strike prior (§ 667, subds. (b)-(i)). The court denied Higgins's motion to replace appointed counsel and denied the motion to dismiss the strike prior.

Higgins was sentenced to the upper term on four years for the spousal abuse count, doubled due to the strike prior. The court added one year for the weapon enhancement, five years for the serious felony prior, and five years for the great bodily injury enhancement. The total term imposed was 19 years in prison.

Higgins filed a timely notice of appeal.

Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) indicating counsel has not been able to identify any arguable issues for reversal on appeal. Counsel asks the court to review the record for error as mandated by *Wende*. We offered Higgins the opportunity to file his own brief on appeal, but he has not responded.

STATEMENT OF FACTS

Appellant's opening brief contains an accurate summary of the facts produced at trial. We will incorporate that summary here for convenience.

A. The Relationship Between Higgins and H. Watson

Higgins and Watson dated for four years from 2012 to 2016, when their relationship ended on Watson's birthday, in July, 2016. It ended because Higgins was angry and upset that Watson had gone out with a girlfriend on her birthday. He had a history in the relationship with being always angry. On that particular day, after she returned from her night out, they got into an argument, and he held her hostage with a loaded gun for two and one-half hours and threatened to kill her and her daughter. Higgins had been keeping

a gun at her house because she had a rabbit problem destroying her grass. After she called the police the next day, Higgins was charged and pleaded guilty to making criminal threats, and the court also imposed a five-year protective order against him. He was not convicted of assaulting her with a firearm.

## B. The Incident at Costco

On March 23, 2018, with the protective order still in effect, Watson went to Costco in Carlsbad to buy a few things before heading to the hairdresser. When she arrived, she parked in a spot that she and Higgins used to park in, near the concession stand. She went in, bought her items, then returned to her car and started putting the stuff into her back seat. While she was emptying her cart, she turned around and Higgins was standing between her and the cart. He had boxed her in so she could not leave and hit her really hard and pushed her against the car door. He then shoved her onto the floor of her car and she felt sharp pains in her back; he had stabbed her four times in the back. He further shoved his thumb into her eye.

At the time Watson could hear people walking by, and she heard one of them ask Higgins if she was all right to which he responded, "she is having a seizure. She is fine." He was still holding her down while he was talking to the others. She somehow got up and tried to fight back and then he cut her throat. She next thing she remembered was someone helping her up and the paramedics taking over.

When she arrived at the hospital, the trauma team took a CAT scan and then operated on her neck to repair the injury on her neck. She woke up in the ICU where she remained for eight or nine days. She had also suffered a stroke while the doctors were working on her so she was paralyzed on her

right side for some time. She needed rehab until August of 2019 and also needed to get her eye fixed by a specialist. She suffered long-term effects to her voice.

S.W. was one of the people who witnessed this incident. She went to Costco to return some goods, and while leaving the parking lot, she saw a man and a woman on the ground, with the man kneeling on the woman. The woman was bleeding and gasping for air, and her face was bluish-white; she said, "help me. He's trying to kill me." S.W. stopped and asked them if they need help to which the man, later identified as Higgins, replied that everything was fine and that she could go.

At the same time, other people, including W.M. and B.S. were other people involved in the incident. B.S. was driving out of the parking lot when he saw legs and feet underneath some parked cars, and as he got close, he saw the legs shaking and convulsing. While driving by, he saw a man, identified as Higgins on top of the woman, so he pulled over and got out of the car. Initially B.S. thought the man was helping the woman but realized as he approached the man was actually pinning the woman to the ground. The woman appeared unconscious, and he saw Higgins punch her in the back. B.S. then yelled at Higgins to get off of her; Higgins paused, looked at him, then continued to punch her in the face. B.S. yelled at him some more and then Higgins began to kick her in the head; she was not moving. B.S. then approached Higgins so Higgins came toward him, and was getting ready to hit B.S. B.S. told a woman, S.W., who was looking on, to call 911. B.S. and Higgins continued to square off and then Higgins attacked B.S. getting ready to hit him; B.S. hit Higgins instead. Higgins then ran off toward Costco. At the same time, B.S. saw the police show up.

4

W.M. also heard B.S., tell Higgins to "get off her."  He saw a woman on the ground by the car with her face bashed in and bleeding.  He also saw the B.S. squaring off with Higgins, with Higgins trying to go in the direction of the woman.

W.M. told Higgins to back off; the guy looked back and forth between W.M. and B.S., and then went in another direction.  W.M. attended to the woman who was shaking and bleeding when Higgins drove up again, stared at them, then drove off.

Higgins returned in his car and tried to go after the woman again, but was stopped by other bystanders.  S.W. was able to get the license plate of the car he was driving.  Higgins eventually took off again.

### C.  The Police Investigation

Detective Jencen was the first officer to respond to the 911 call, and when he arrived, there was a group gathered around a woman who was lying on the ground with blood on her face and hands and a gentleman behind her comforting her.  He went to speak to the woman who told him that Higgins was the person who did this to her and that he lived in Carlsbad.  The detective then aired that information over the police radio to help identify and locate Higgins.  Another officer told him that he believed that the woman had been stabbed, so the detective lifted up her shirt and saw a couple of stab wounds.  He also spoke to B.S. and took his statement of what happened.  He stayed at the scene of the crime to maintain the crime scene security until the lead detective Kovanda showed up and then left.

Detective Jencen then learned that Higgins had been detained in Temecula and went and took custody of him to bring him into the Carlsbad station.

5

Deputy Voung worked for the county parole alternative custody unit and helped monitor those in the criminal justice system who have a GPS monitoring bracelet on while in the community. People who wear a GPS bracelet on have a schedule they have to adhere to. It is very difficult to take off the bracelet, and if it had been tampered with, it would set off a tamper alert.

On March 23, 2018, he received a notification that one of their participants, Higgins, was fleeing from a stabbing at a Costco. He checked the computer for Higgins's last location and it showed in the north county area of San Marcos, heading north toward the Temecula/Murrieta area. He notified different police agencies, and eventually Higgins was apprehended.

Officer Foster who worked for the United States Border Patrol was doing a roving patrol and received a dispatch call to assist in locating a suspect, Higgins. He and his partner sat at the intersection of Interstate 15 and Interstate 215 until they got an updated location from downtown Temecula. He activated his lights and sirens when they got behind what they confirmed to be the car they were pursuing; the cars were stuck in traffic so the car couldn't move. Then the driver, Higgins, leaned over into the passenger seat, picked up a gas can started pouring fluid over himself and tried to start a lighter. The officers approached the car, hit the lighter out of his hands and took Higgins out of the car. They handcuffed him and noticed he had what appeared to be bloodstains on his clothing; one officer also found a knife in his pocket and discovered his GPS ankle monitor covered in tinfoil. Higgins was coherent and answered their questions; the officer thought he seemed distraught but resigned.

In Higgins's car, the officers found pruning loppers and tinfoil on the floor, and when the sergeant inspected the GPS monitor, he could see marks

6

on it consistent with the loppers; Higgins also had fresh marks on his leg in the same place the monitor was placed. Two handwritten notes were found in the center console; one had the streets Sycamore and Meredith written on it, which ended up to be the intersection that was the entrance to an apartment complex where J. Silverman, the victim's daughter, lived. There was also the Oak Park Cemetery near that address, where Higgins had planned to bury his pet. The other handwritten note had the address of Silverman's father. The note also had a 52 and an E, which the officer thought meant 52 East which is the road that would lead you right to that address.

Sergeant Kovanda was the lead detective on the case, and also arrived at the Costco parking lot in Carlsbad after receiving the 911 call. The scene was already secured, so he spoke to the witnesses and started investigating the suspect. He also spoke to the loss prevention people for surveillance tapes, and was able to see that both Watson and Higgins were in the store at the same time. After Higgins was brought back from Temecula, the sergeant interviewed him after he was apprehended for four to five hours.

D.  Higgins's Testimony

Higgins learned three years ago he suffered from a brain tumor; because of that, he had cognitive problems and difficulty remembering. It is a degenerative condition that gets worse progressively. He sought treatment right away and was prescribed antidepressants, but they had a bad effect on him. He was not on them during the prior criminal case in 2016; instead, he was prescribed them after that conviction. He was also prescribed Temazepam because he could not sleep. His third set of antidepressants caused him to become agitated and he thought caused him to blackout. When

7

he told his psychiatrist, she said you can't just stop them, so reduce them to one.

He had been in a romantic relationship with Watson for four years before they broke up on her birthday. It ended because he assaulted her in her garage because he was mad as he thought she was having an affair. He had a gun at her house to shoot bunnies in her yard, but it had only been there for three days.

He eventually pleaded guilty to making a threat but as a result, the assault with a firearm charge, the use of a gun charge, the domestic violence charge, the assault charge and the false imprisonment charge were all dismissed. As a result of the conviction, the court also imposed a criminal protective order against him that required him to stay a 100 yards away from Watson; this required he move out of his house and move into his son's condominium as he lived very close to Watson, which made him angry.

Because of that conviction, he was on house arrest, had to wear a GPS monitor and in order to do anything or leave the house, he had to get permission from his case manager. He only had permission to shop at Costco and Stater Brothers for one hour; he normally went to Costco for four items—pistachio nuts, mangos, chai tea, and exam gloves. He used the gloves for fixing his bicycle to avoid the grease.

On March 23, 2018, he was making his bimonthly trip to Costco. But, when he entered that day, after he grabbed his chai tea, he came in contact with Watson. He knew he was not supposed to have contact with her so he put the tea down and left the store. He was going to wait outside until she left and then go back in and buy the tea even though he knew he had to be 100 yards away from her.

After Watson came out of the store, he followed her to her car because he was upset with her; she turned and saw him and he saw the hatred in her eyes.  He believed he pushed her and the next thing that he remembered was that someone hit him in the temple.  He did not remember taking out a knife or punching, kicking or stabbing Watson.  He did not remember S.W. stopping and asking him what was going on?  He remembered interacting with B.S. in the parking lot but only remembered taking a step forward and the other guy went back, so Higgins got into his car to leave.  He also remembered B.S. hitting him in the head.  He never noticed any blood on his hand or clothes.

As he was leaving the parking lot, he drove past Watson's car and he saw Watson on the ground; at that point, he figured he had hurt her, so he stayed for a few minutes trying to process it and then left.  He never intended to kill her.  After he left, he couldn't find his phone, so he couldn't contact his children, and decided to take his own life.

He drove around for a while, went to a gas station to buy a gas can and two gallons of gas to commit suicide at the Dana Point harbor; he then noticed he had blood on his hands so he realized he had done something to Watson.  At that point, he tried unsuccessfully to use the pruning shears in his car to cut off his GPS monitor, so he then decided to cover it with tinfoil to prevent detection.  He had planned to drive up the 15 to the Ortega Highway to get to Dana Point.  He drove around Temecula but was disoriented and was headed back down to San Diego, realized he was running out of gas so went and got gas and bought an iced coffee at McDonalds.  He was trying to find the Ortega Highway, but as soon as he pulled out of McDonalds, he saw a police car behind him.  Three officers came to his door, so he got his gas can and poured gas over his head and tried to light it to commit suicide.  He

9

couldn't start the lighter so gave up and got out of his car, and was arrested and taken to the Carlsbad Police Station.

The handwritten notes in his car were directions to a pet cemetery that Watson had given him when his dog was dying of cancer near where her daughter had bought a home; it had come out of his console when he was looking for matches as did the other paper with Silverman's father's address.

E. Medical Testimony

Doctor Alan Abrams, a licensed psychiatrist and attorney in the state of California, reviewed Higgins's medical records and interviewed Higgins for about three hours. In 2013, Higgins was diagnosed with a growth on the brain (papilloma), causing hydrocephalus or swelling of the brain from overproduction of fluid. The excess fluid causes the brain to die slowly which could be the reason for Higgins's memory loss and increase in irritability or loss of ability to inhibit annoyance and frustration. He suffers from brain damage, and things like PTSD are an emotional response, which is not brain damage. He was not receiving treatment for this condition at the time of the incident. He was also blind in one eye but he never complained about that. Higgins was fired from his job because of memory problems but not because of blackouts or violent outbursts.

He was taking Temazepam or Restoril for sleep disturbance and depression which can all further reduce a person's prefrontal cortex ability to inhibit bad behaviors but he was only taking half of the prescribed amount of antidepressant. This combination of medicine could cause explosive rage and cause people to blackout, but blackout period tends to be very quick. It could also affect his ability to form specific intent. Higgins had no cognitive defects that impaired his ability to control his behavior. He was just using terrible judgment.

10

The doctor thought Higgins was an angry guy but did not know whether that was a lifelong characteristic or something that changed with the hydrocephalus. Everything he did was anger related and whether he lacked the ability to inhibit his anger or still had some ability to control it. The doctor noted there was nothing in his criminal history about his blacking out or losing the ability to control himself. But he admitted that someone with these medical and brain issues might not have the ability to form the intent to kill.

## DISCUSSION

As we have noted, appellate counsel has filed a *Wende* brief and asks the court to review the record for error. To assist the court in its review, and in compliance with *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel has identified the following possible issues that were considered in evaluating the potential merits of this appeal:

1. Did the court err when it failed to state reasons for imposing the upper term on the enhancement for great bodily injury even when the defense failed to object?

2. Did the court err by failing to instruct the jury on spousal battery as a lesser offense of corporal injury?

We have reviewed the entire record as required by *Wende* and *Anders.* We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Higgins on this appeal.

## DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.